# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

---

| | |
|---|---|
| **In Re** | |
| JUDITH M. K. FARSON, | **Bankruptcy Case No. 05-41966-JDP** |
| **Debtor.** | |

---

| | |
|---|---|
| GARY L. RAINSDON, Trustee, | |
| **Plaintiff,** | |
| **vs.** | **Adv. Proceeding No. 07-8077** |
| JUDITH M. K. FARSON and DAVID L. SCANTLIN, | |
| **Defendants.** | |

---

## MEMORANDUM OF DECISION

---

**Appearances:**

William R. Hollifield, HEPWORTH & ASSOCIATES, Twin Falls, Idaho, Attorney for Plaintiff.

Jay D. Sudweeks, MAY, SUDWEEKS & BROWNING, Twin Falls, Idaho, Attorney for Defendants.

MEMORANDUM OF DECISION - 1

## *Procedural History*

On July 23, 2007, chapter 7[1] trustee Gary L. Rainsdon

("Plaintiff") commenced this adversary proceeding against Defendants

Judith Farson and David L. Scantlin.  Docket No. 1.[2]  Plaintiff's Amended

Complaint alleges that Farson, the debtor, failed to list a Ford Mustang in

her bankruptcy schedules as an asset of the estate, and that the car should

be turned over to the Plaintiff to be sold for the benefit of her creditors.[3]

Plaintiff also alleged that certain payments made by Farson to Scantlin in

connection with her purchase of the Mustang should be avoided and

recovered as preferences.

---

[1] All chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1330, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001– 9036, as they existed prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 108-9, 119 Stat. 23 (Apr. 20, 2005).

[2] The Complaint was amended on August 1, 2007.  Docket No. 6.

[3] The Court takes judicial notice of its file in the chapter 7 case, 05-41966-JDP.  Fed. R. Evid. 201.  Pleadings in the underlying bankruptcy case are designated as "BK Docket No." while the adversary proceeding pleadings are identified as "Docket No."

MEMORANDUM OF DECISION - 2

The Court conducted a trial in this action on January 18, 2008.  At its conclusion, Plaintiff made an oral motion to amend the pleadings to conform to the evidence presented at the trial.  *See* Rule 7015, which incorporates Fed. R. Civ. P. 15(b)(2) (providing that a party may move "at any time" to amend pleadings to conform to evidence presented at trial.) By this motion, Plaintiff sought to add two new claims:  a request that the Court disallow Farson's claim of exemption in the Mustang; and a claim for a money judgment against Scantlin in the amount of $1,874.24 as reimbursement for a lien he caused to be imposed upon the car during the pendency of the bankruptcy without Court approval.  Defendants did not object to the motion, and it was granted.

Following the submission of post-trial briefs, the issues were taken under advisement.  The Court has considered the submissions of the parties, the testimony and evidence presented at trial, the arguments of counsel, as well as the applicable law.  This Memorandum constitutes the Court's findings of fact, conclusions of law and decision on the issues. Rule 7052.

MEMORANDUM OF DECISION - 3

### *Findings of Fact*

At some point prior to June 2003, Scantlin, who was at the time Farson's "friend," purchased a 2000 Ford Mustang. He financed the purchase through Capitol One Auto Finance. Ex. 1; A.

On June 8, 2003, Farson agreed to purchase the vehicle from Scantlin. She signed a Contract of Purchase and Finance ("Contract"), drafted by Scantlin, to evidence the terms of the purchase. Ex. 1. The Contract required Farson to make payments to Scantlin in the amount of $389.21 per month until the total purchase price financed, $14,788.74, was paid. Upon completion of all monthly payments, the Contract also required Farson to pay Scantlin three additional installments of $500 in order to repay the $1,500 he contributed as a down payment when he purchased the vehicle from the dealer. *Id*. The Contract further provided that if Farson failed to make the required payments, the vehicle would be sold and the proceeds remaining after Capitol One Auto Finance was satisfied would be returned to Farson. *Id*. The Contract granted no security interest to Scantlin, but it provided that until Farson fulfilled all

MEMORANDUM OF DECISION - 4

her obligations under the Contract, the Mustang would remain registered

in Scantlin's name.  Ex. 1; Ex. 2.[4]

As time passed, Defendants' relationship became romantic, and

eventually Farson moved into Scantlin's home.  However, Farson

continued to make the monthly car payment to Scantlin, who in turn made

the payment to Capitol One Auto Finance.  On May 12, 2005, Defendants

were married.[5]  At trial, Defendants confirmed that Farson's monthly

payments to Scantlin were ongoing.

---

[4] As the reader has likely concluded, this two-step transaction was
designed as an accommodation by Scantlin to Farson.  Farson needed a vehicle,
but her creditworthiness was questionable.  Scantlin was a willing friend of
Farson, and these transactions allowed Farson to obtain access to a vehicle using
Scantlin's good credit, while, at bottom, requiring Farson to pay for the Mustang.

[5] There is confusion regarding the marriage date.  The Defendants'
wedding occurred in Honduras on May 12, 2005.  However, they did not receive
documentation of their marriage that would be legally recognized in the United
States until sometime between Thanksgiving and Christmas, 2005.  Furthermore,
the certificate they eventually received reflected a marriage date of April 29,
2005, which Farson opines was the date their paperwork was received by the
Honduran government.  Farson was unable to change her legal name, driver's
license, or Social Security card until she received the official documents.

MEMORANDUM OF DECISION - 5

On August 30, 2005, Farson filed a chapter 7 petition.[6]  Plaintiff was

appointed to serve as trustee.  Ex. 3; BK Docket No. 1.  Farson did not list

the Mustang as her asset on Schedule B, nor did she claim the vehicle

exempt on Schedule C.  Ex. 3.  Curiously, though, Farson did list Scantlin

as a secured creditor on Schedule D, and she valued his claim at $13,000,

indicating that the value of the collateral for his claim was $9,000, thereby

yielding an unsecured claim of $4,000.  *Id*.  On Schedule I Farson listed her

marital status as "Single" and she listed no spouse.  *Id*.  Further, in answer

to question 14 on the Statement of Financial Affairs concerning property

held for another person, Farson noted that Scantlin was the owner of the

Mustang, that it was valued at $9,000 and that it was located in "[Farson's]

control & possession".  *Id*.  On question 15, she noted that she had lived at

---

[6]  The petition is dated August 29, 2005, but appears to have been filed
with the Court on August 30, 2005.  BK Docket No. 1; 4.  Farson testified that she
believed her petition had been filed prior to her May, 2005 marriage, and that she
had signed only one petition and set of schedules, and concluded that her
original attorney must have held onto her schedules and filed them much later.
However, Farson's testimony is, at best, mistaken, since the "wet signature
petition" retained by the clerk of this Court shows that she signed her petition
and schedules on August 29, 2005.  Court's Ex. 100.

MEMORANDUM OF DECISION - 6

a different address prior to filing the petition until October, 2004,

presumably at which time she moved in with Scantlin, because it is his

address she listed as her own on the petition. *Id*. In the response to

question 16, Farson marked the box indicating "none" when asked about

spouses and former spouses. *Id*. Finally, in the form entitled "Chapter 7

Individual Debtor's Statement of Intention," Farson notes the auto loan,

Scantlin as the creditor, and that she "will retain collateral and continue to

make regular payments." *Id*.

At the § 341(a) meeting of creditors held on September 22, 2005,

Farson testified that Scantlin was "a friend;" of course, as noted above,

they were a married couple by that date.

After Farson filed her bankruptcy petition, on February 1, 2007,

Scantlin borrowed money from Farmers National Bank ("Farmer's Bank

Loan") offering the Mustang as security for the loan. The lender paid off

Capitol One Auto Finance, and advanced additional sums to Scantlin.[7] Ex.

---

[7] The Farmers Bank Loan documents indicate a principal loan amount of
$7,000, of which $2,227.79 was paid to Capitol One Auto Finance. Ex. 7. The
remainder went to pay off credit cards, make minor repairs to the vehicle, and

MEMORANDUM OF DECISION - 7

7.   Plaintiff did not consent to this transaction, nor was it authorized by

this Court.

On March 15, 2007, Plaintiff conducted Rule 2004 examinations of

both Defendants.  BK Docket No. 21; 24.  During her exam, Farson

acknowledged that she and Scantlin had been married in May, 2005.

On July 23, 2007, Plaintiff commenced this adversary proceeding.

Docket No. 1.  A month later, on August 22, 2007, Farson amended her

schedules to list the Mustang as her asset, and to claim it exempt.  Ex. 4; 5.

### *Analysis and Disposition*

### I.  The Preference Claim

A.  Elements of Preference

---

pay fees associated with the loan.  The vehicle was the sole collateral on the
Farmers Bank Loan.  *Id*.  As of the trial date, Scantlin owed approximately
$1,874.24 on the Farmers Bank Loan.  Ex. D.

MEMORANDUM OF DECISION - 8

Plaintiff claims the payments made by Farson to Scantlin during the

one year prior to the filing of the petition are avoidable as preferences

under § 547(b).[8]

> In order to avoid a transfer as a preference under
> the Code, the trustee must prove by a
> preponderance of the evidence that a transfer of
> property of the debtor occurred and that such
> transfer (1) was made to or for the benefit of the

---

[8] Section 547(b) provides that "the trustee may avoid any transfer of an
interest of the debtor in property –
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by
> the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
>> (A) on or within 90 days before the date
>> of the filing of the petition; or
>> (B) between ninety days and one year
>> before the date of the filing of the
>> petition, if such creditor at the time of
>> such transfer was an insider; and
> (5) that enables such creditor to receive more than
> such creditor would receive if –
>> (A) the case were a case under chapter 7
>> of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such
>> debt to the extent provided by the provisions
>> of this title.

MEMORANDUM OF DECISION - 9

> creditor; (2) for or on account of an antecedent
> debt; (3) while the debtor was insolvent; (4)
> within 90 days before the date of filing of the
> petition; and (5) enabled the creditor to receive
> more than it would have received in a chapter 7
> liquidation if the transfer had not been made.

*Crawforth v. H & H Enterprises (In re Larison)*, 05.3 I.B.C.R. 74, 76 (Bankr. D.

Idaho 2005) (quoting *Elsaesser v. Cent. Pre-Mix Concrete Co. (In re Pioneer*

*Constr., Inc.)*, 01.2 I.B.C.R. 66, 67 (Bankr. D. Idaho 2001)) (additional

citations omitted).

Under § 547(g), Plaintiff as trustee "has the burden of proving the

avoidability of a [preferential] transfer . . . ."  Because Defendants have not

conceded that any of the elements of § 547(b) have been met, the Court

must decide whether Plaintiff has satisfied his burden of proof as to each

element.

1.  *Transfer of Debtor's Property to Creditor*

Prior to filing her petition, Farson made monthly payments to

Scantlin under the terms of the Contract.  It is unclear in what form Farson

made those payments to Scantlin.  The Code does not define what

MEMORANDUM OF DECISION - 10

constitutes property of the debtor, however, the Ninth Circuit has defined

the term broadly.  It has stated:

> Generally, property belongs to the debtor for
> purposes of § 547 if its transfer will deprive the
> bankruptcy estate of something which could
> otherwise be used to satisfy the claims of
> creditors.

*Danning v. Bozek (In re Bullion Reserve of North Am.)*, 836 F.2d 1214, 1217

(9th Cir.), *cert. den.*, 486 U.S. 1056 (1988).  Thus, whether Farson paid

Scantlin in cash or by check, the transfer of those funds deprived the estate

of monies which could have been used to pay creditors' claims.

Accordingly, Plaintiff has demonstrated that there were transfers of

Farson's property – her money – to Scantlin.

   *2.  Antecedent Debt*

       Section 547(b)(2) allows recovery of transfers made "on account of

an antecedent debt owed by the debtor before such transfer was made

. . . ."  In other words, "[i]f the debt was created before the transfer

occurred, the debt is antecedent."  *Lake City R.V.*, 99.2 I.B.C.R. at 53 (citing

MEMORANDUM OF DECISION - 11

*Fitzgerald v. Blackman (In re Blackman)*, 92 I.B.C.R. 209, 211 (Bankr. D. Idaho 1992)).

The Contract requiring payments from Farson to Scantlin was executed on June 8, 2003. The evidence therefore shows that any payments made by Farson to Scantlin thereafter were on account of an antecedent debt.

3. *Insolvency*

Under § 547(b)(3), Plaintiff must show that, at the time she made the payment to Scantlin, Farson was insolvent.[9] However, Plaintiff is aided in satisfying his burden, at least in part, by § 547(f), which provides that Farson "is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." While this presumption effectively shifts the initial burden of proof, if Scantlin provided substantial evidence that Farson was solvent when payments

---

[9] In section 101(32)(A), Congress defines "insolvent" with regard to individuals as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation" minus property that has been concealed or transferred with intent to defraud, as well as property that is exempt under § 522.

MEMORANDUM OF DECISION - 12

were made, then the presumption vanishes, and Plaintiff would again bear the burden of proving Farson's insolvency. *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 277 (9th Cir. BAP 1989).

Here, Defendants presented no evidence to show that Farson was solvent during the ninety-day prebankruptcy period. Therefore, to prevail on this issue, Plaintiff was not required to present any evidence to show Farson was insolvent during this time.

4. *Timing of Transfers and Scantlin's "Insider" Status*

For Plaintiff to recover, § 547(b)(4) requires that he prove that the target transfers from Farson to Scantlin occurred either: (a) within the ninety days preceding the filing of her bankruptcy petition; or (b) that Scantlin was an insider, and the payments were made within one year preceding the bankruptcy filing.

Defendants' testimony confirmed that Farson's monthly payments to Scantlin were ongoing from and after the date they executed the Contract through trial. There is no evidence to suggest Farson ever missed a monthly payment. The Court may, and does hereby, infer that Farson

MEMORANDUM OF DECISION - 13

made at least two payments to Scantlin during the period of June 1 to

August 30, 2005, which constitutes the ninety days prior to the filing of the

bankruptcy petition.  Whether or not Plaintiff can recover payments made

outside the ninety-day period, during the one year prior to the filing date,

depends upon whether Scantlin was an "insider" under the Code.

As relevant to the issues here, § 101(31)(A)(i) defines "insider" to

include a "relative of the debtor . . . ."  A "relative," in turn, is an

"individual related by affinity or consanguinity within the third degree as

determined by the common law, or individual in a step or adoptive

relationship within such third degree." 11 U.S.C. § 101(45).  A debtor's

spouse is a relative because this definition includes individuals "related [to

the debtor] by affinity".  *Miller v. Schuman (In re Schuman)*, 81 B.R. 583, 585

(9th Cir. BAP 1987).  Thus, Scantlin was an insider as to Farson from and

after at least May 12, 2005.[10]

_____

[10]  The Court elects to use May 12, 2005 as the Defendants' marriage date,
since it appears from their testimony at trial that they considered themselves to
have been married on that date despite the documentation challenges they
encountered upon their return from Honduras to Idaho.

MEMORANDUM OF DECISION - 14

Prior to his marriage to Farson, Scantlin would not qualify as an insider under any of the other particular provisions of the Code's definition. However, "[t]he use of the word 'includes' [in § 101(31)] is indicative of Congress' intent not to limit the classification of insiders to the statutory definition." *Miller Ave. Prof. and Promotional Servs, Inc. v. Brady (In re Enter. Acquisition Partners, Inc.)*, 319 B.R. 626, 631 (9th Cir. BAP 2004) (quoting *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69-70 (9th Cir. BAP 1991); 11 U.S.C. § 102(3) (providing that "'includes' and 'including' are not limiting"). Thus, there are effectively two types of insiders under the Code: those persons specifically described by category in § 101(31), the so-called *per se* insiders (*e.g.*, "relative," "partnership," "general partner," and "corporation"); and those persons not specifically listed in the statutory definition, but who have an otherwise "sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *Miller,* 319 B.R. at 631 (quoting *Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712 F.2d 206, 210 (5th Cir. 1983)) (quoting

MEMORANDUM OF DECISION - 15

S. Rep. No. 95-989, 95th Cong., 2d Sess., *reprinted in* [1978] U.S. Code Cong. & Admin. News, pp. 5787, 5810).

The courts have struggled with what constitutes a "sufficiently close relationship" requiring such "closer scrutiny." The determination is a fact-intensive one, and must be decided on a case-by-case basis. *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 285 (Bankr. E.D. Va. 1999); *Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship)*, 213 B.R. 292 298 (D. Md. 1997). This Court has held that a "transferee 'is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not arms-length.'" *Elsaesser v. Cougar Crest Lodge, L.L.C. (In re Weddle)*, 353 B.R. 892, 901 (Bankr. D. Idaho 2006) (citing *Enter. Acquisition Partners*, 319 B.R. at 633 n. 5) (quoting *In re Schuman*, 81 B.R. at 586); see also *Practical Inv. Corp. v. Rellen (In re Practical Inv. Corp.)*, 95 B.R. 935, 941 (E.D. Va. 1989) (insider must have considerable control or high likelihood of control over debtor, not just mere financial power (like a lending agency) over debtor). Under § 547(b), insider status

MEMORANDUM OF DECISION - 16

must be evaluated in relation to the debtor and at the time of the transfer.

*Weddle*, 353 B.R. at 900.

Some of the decisions and factual scenarios where courts have found

that a person was not an insider include:  *Schuman*, 81 B.R. 583 (9th Cir.

BAP 1987) (Debtor's ex-wife did not exert sufficient influence over him to

render her an insider where debtor had remarried at the time of the

transfer, his relationship with ex-wife was hostile, and negotiations

between debtor and ex-wife were adversarial in nature); *Pfeiffer v. Thomas*

*(In re Reinbold)*, 182 B.R. 244 (D. S.D. 1995) ("friendship" alone is

insufficient to confer insider status; creditor needs to dominate the debtor

in order to rise to the insider level); *Barnhill v. Vaudreuil (In re Busconi)*, 177

B.R. 153 (Bankr. D. Mass. 1995) (debtor's spouse held not to be an insider

regarding transfers made pursuant to a antenuptial agreement during the

course of acrimonious divorce proceedings even though transfers were

made before divorce was final);  *Thrush v. Marvin (In re Hollar)*, 100 B.R.

892 (Bankr. N.D. Ohio 1989) (mere fact that debtor and transferee were

engaged to be married was not enough to confer insider status in the

MEMORANDUM OF DECISION - 17

absence of other evidence); *Jackson Purchase Prod. Credit Ass'n v. Taylor (In re Taylor)*, 29 B.R. 5 (Bankr. W.D. Ky. 1983) (buyer who had previous business transactions with debtor including construction of home and a loan, and debtor's classmate and friend, did not have sufficiently close relationship with debtor to constitute insider); *Bahas v. Sagen (In re Durkay)*, 9 B.R. 58 (Bankr. N.D. Ohio 1981) (attorney for debtor who represented debtor and debtor's corporation in complex litigation was not insider of debtor).

On the other hand, cases in which the court found an individual to be an insider include: *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008 (5th Cir. 1992) (former wife of debtor who loaned him money after divorce deemed insider in view of their continuing friendly relationship and joint hostility toward other party in litigation); *Freund v. Heath (In re McIver)*, 177 B.R. 366 (Bankr. N.D. Fla. 1995) (debtor and insider had a personal and financial relationship and lived together for over two years; insider financed the debtor's investments, debtor appointed insider to be a director of his corporation, insider allowed debtor to use her credit cards,

MEMORANDUM OF DECISION - 18

and debtor executed holographic will to insure that the insider would be repaid); *Wiswall v. Tanner (In re Tanner)*, 145 B.R. 672 (Bankr. W.D. Wash. 1992) (debtor and insider lived together in an intimate homosexual relationship which was marked by a ceremony where one partner was dominant and exerted control over debtor); *Rush v. Riddle (In re Standard Stores, Inc.)*, 124 B.R. 318 (Bankr. C.D. Cal. 1991) (former brother-in-law of debtor's principal deemed insider even after divorce because of continued friendship as evidenced by loan and status as long-time general manager of debtor); *Grant v. Podes (In re O'Connell)*, 119 B.R. 311 (Bankr. M.D. Fla. 1990) (debtor and insiders were personal friends and over $400,000 of loans were exchanged between the parties over a four year period on an informal basis with no documentation); *Castellani v. Kohne (In re Kucharek)*, 79 B.R. 393 (Bankr. E.D. Wis. 1987) (debtor and insider were close friends for many years and many loans were made between them without any signed promissory notes); *Montanino v. Minar (In re Montanino),* 15 B.R. 307 (Bankr. D. N.J. 1981) (debtor lived with the insiders' daughter and

MEMORANDUM OF DECISION - 19

indicated they were his relatives in a deed conveying real property to

them).

Based upon the evidence in this case, Farson and Scantlin were

apparently "friends" at the time they entered into the Mustang transaction,

then at some later time became romantically involved, lived together, and

eventually married.  Beyond this, the Court is unable to understand the

time line of Defendants' blossoming relationship, nor the degree and

extent, if any, that Scantlin might have exercised influence over Farson.

For example, the record does not reflect when the Defendants became

engaged, although it is clear that at least by April 29, 2005, they had made

plans to marry in Honduras, and had filed the necessary paperwork with

the Honduran government to do so.  However, Farson's status as

Scantlin's "girlfriend and future fiancee" is not, alone, enough to establish

insider status.  *Hollar, supra.*

It appears from Farson's Statement of Financial Affairs that

Defendants lived together in Scantlin's home beginning in October, 2004.

However, there is little evidence in the record about their financial

MEMORANDUM OF DECISION - 20

dealings prior to their marriage, *e.g.*, whether they commingled their

finances, whether they spoke about money matters, and such.  Farson

apparently made payments to Scantlin from and after June, 2003, first as

creditor, then as boyfriend, roommate, and finally as her husband,

pursuant to the terms of the Contract.  Strictly speaking, there is no

evidence that Scantlin ever exercised the sort of influence and control over

Farson's decision-making so as to render her contractual obligation to

make payments to him less than "arm's-length."  Based upon this record,

the Court is unwilling to infer that Defendants' relationship was such that

it should be regarded with the sort of "greater scrutiny" required for

insider status at any time prior to May 12, 2005, when Scantlin became a

*per se* insider.

In summary, Plaintiff has not proven that, for purposes of

§ 547(b)(4)(B), any payments made by Farson to Scantlin occurring prior to

their marriage were made to an "insider."  Under § 547(b)(3), Plaintiff may

therefore assail only those payments made by Farson to Scantlin between

May 12, 2005, and the bankruptcy petition date, August 30, 2005.  During

MEMORANDUM OF DECISION - 21

the ninety days prior to the bankruptcy date (*i.e,* June 1, 2005) Farson was

presumed to be insolvent, a presumption that has not been rebutted by

Scantlin.  However, if Farson made payments to Scantlin during the 19-

day window between May 12 and June 1, to avoid them, Plaintiff must

prove that Farson was insolvent at the time without benefit of the statutory

presumption.

Plaintiff's proof concerning the amount and timing of payments is

vague and deficient.  The Contract requires monthly payments, but does

not obligate Farson to make those payments on or before any particular

date during any given month.  And Plaintiff did not present any specific

evidence concerning when Farson made individual payments.  Instead, the

testimony showed only that Farson had been continually paying Scantlin

under the terms of the Contract, and was still paying him even up to the

date of trial.

From this evidence, the Court has no way to determine when the

payment due in May, 2005 was made.  As a result, the Court cannot find

that any payment was made by Farson to Scantlin as an insider during the

MEMORANDUM OF DECISION - 22

extended reach-back period from May 12 to June 1, 2005.  Indeed, based

upon the evidence, while the Court can, and does, find that the May, 2005

contract payment was made, it is certainly as plausible that Farson made

that transfer prior to, as opposed to on or after, May 12, 2005.  Because the

Plaintiff has not proven a payment was made to Scantlin as an insider

between May 12 and June 1, 2005, it is unnecessary for the Court to decide

whether Farson was insolvent at the time.[11]

By the same token, Plaintiff failed to submit evidence that would

allow the Court to find when the August, 2005 monthly payment was

made by Farson to Scantlin.  As a result, it would be mere speculation for

the Court to assume that the payment was not made after August 30 – on

_____

[11]  For what it's worth, the proof presented at trial regarding Farson's
insolvency was ambiguous.  Farson testified that she initially sought counsel
regarding the possibility of filing for bankruptcy in December, 2004, and Scantlin
testified that he knew, prior to their marriage, that Farson likely intended to file
for bankruptcy, and that she had already consulted with a bankruptcy attorney.
Beyond that testimony, the Court has only Farson's schedules upon which it
could decide the issue of insolvency.  While Farson's schedules indicate at filing
she had virtually no assets, and approximately $61,000 in liabilities, it is difficult
to determine her financial status as any given point in time prior to bankruptcy.

MEMORANDUM OF DECISION - 23

August 31 or some date thereafter – thereby insulating it from avoidance

as a preference.[12]

All things considered, because both Defendants testified that

Farson's monthly car payments were current when she filed her

bankruptcy petition, the Court finds that Farson made two monthly

payments to Scantlin in the amount of $389.21 each during the ninety days

prior to bankruptcy that are potentially avoidable by Plaintiff as a

preference.

5.  *Inequitable Receipt*

The final element in the preference analysis, found in § 547(b)(5),

requires Plaintiff to prove that, if the target transfers were allowed to

stand, Scantlin would receive more than he would otherwise have

received as an unsecured creditor in a hypothetical liquidation of Farson's

---

[12]  If payments were made by Farson to Scantlin after the petition was filed
using property of the bankruptcy estate, they may be avoidable under § 549(a) as
unauthorized post-petition transfers.  However, Plaintiff did not allege nor prove
any such claim.

MEMORANDUM OF DECISION - 24

assets under chapter 7.   Plaintiff has successfully shown this to be true here.

Even a cursory review of Farson's schedules reveals that she had considerably more unsecured debt than assets.  And, while Farson listed Scantlin as a secured creditor on Schedule D, his counsel concedes, and the Court agrees, that the Contract securing Farson's obligation to pay for the vehicle is insufficient to bestow secured status on him.  Therefore, Scantlin is a general unsecured creditor.

There are three creditors listed in Farson's schedules that hold unsecured priority claims totaling $10,191.99.  Given that Farson's amended schedules list a total of $6,635 in assets, it is unlikely there would have been full distribution to the priority unsecured creditors, let alone the general unsecured creditors.  As a result, the Court can confidently conclude that any payments Scantlin received during the preference period allowed him to fare much better than he would have as a general unsecured creditor in a chapter 7 bankruptcy case.

MEMORANDUM OF DECISION - 25

In summary, the Court concludes that all elements of § 547(b) have

been met as to the June and July, 2005, payments.

B.  Contemporaneous Exchange Defense

Having determined that two monthly payments made by Farson to

Scantlin are preferences, the burden shifts to Scantlin to show that one or

more of the exceptions to avoidance under § 547(c) insulates these

payments from avoidance.  11 U.S.C. § 547(g) (providing that the

defendant in a preference action bears "the burden of proving the

nonavoidability of a transfer under subsection (c) of [§ 547] . . . ."); *Larison*,

05.3 I.B.C.R. at 76 (citing *Pioneer Constr.*, 01.2 I.B.C.R. at 67).

Scantlin contends, without any further explanation, that "[t]here is

not a preference in this case because there was a contemporaneous

exchange and it was for new value."  Docket No. 17.  Presumably, Scantlin

intended to invoke the contemporaneous exchange defense found in

§ 547(c)(1).[13]  That exception protects a transfer:

_____

[13]  It appears Defendants' counsel may be mistaken in his understanding
of the burden of proof.  In post-trial briefing, he states, "In any event, one need
not get to the insolvency issue because it was a contemporaneous exchange and

MEMORANDUM OF DECISION - 26

> (1) to the extent that such a transfer was –
> > (A) intended by the debtor and the
> > creditor . . . to be a contemporaneous
> > exchange for new value given to the
> > debtor; and
> > (B) in fact a substantially
> > contemporaneous exchange[.]

11 U.S.C. § 547(c)(1).

"The rationale for the exception is that, because new value is given, a contemporaneous exchange does not diminish the debtor's estate." *Endo Steel, Inc. v. Janas (In re JWJ Contracting Co., Inc.)*, 371 F.3d 1079, 1081-82 (9th Cir. 2004) (citing *Milchem Inc. v. Fredman (In re Nucorp Energy)*, 902 F.2d 729, 733 (9th Cir. 1990).

In order for Defendants to take advantage of this defense, there must have been, in fact, new value advanced by Scantlin to Farson in exchange for each of her payments. In this way, Farson's bankruptcy estate would not have been diminished as a result of the payments made.

---

it was for new value." Docket No. 17, p. 3. Of course, it was Plaintiff's burden to prove the elements of § 547(b). Then, and only then, would the Court entertain any suggestion that the payments made constitute a contemporaneous exchange for new value, something Scantlin must prove. *See Larison, supra*.

MEMORANDUM OF DECISION - 27

For this purpose, "new value" is defined as:

> money or money's worth in goods, services, or
> new credit, or release by a transferee of property
> previously transferred to such transferee in a
> transaction that is neither void nor voidable by
> the debtor or the trustee under any applicable
> law, including proceeds of such property, but
> does not include an obligation substituted for an
> existing obligation.

11 U.S.C. § 547(a)(2).  To perform a contemporaneous exchange analysis,

the Court must be able to measure the value given to Scantlin, as well as

the new value given by him to Farson, as the transfer is only excepted

from avoidance *to the extent* the transfer was given for that new value.

*Sulmeyer v. Pacific Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 733 (9th

Cir. 1994); *In re Nucorp Energy*, 902 F.2d at 733; 11 U.S.C. § 547(c)(1).

The Contract required Farson to make monthly payments to Scantlin

of $389.21 each, and there is no evidence to show that she ever paid him

any amount less than what was contractually due.  The basis of  Scantlin's

contemporaneous exchange argument is not explained in his brief, but

presumably, he contends that when he, in turn, made the payments due to

MEMORANDUM OF DECISION - 28

Capitol One on the Mustang, he extended "new value" and Farson was

benefitted.  However, it is undisputed that Farson was purchasing the

Mustang from Scantlin, and that she was not obligated on Scantlin's

Capital One loan.  It is therefore difficult to see how Scantlin's payments to

Capital One amounted to new value given to Farson, or how she

benefitted from such payments.  Simply making installment payments on

a loan does not meet the requirements for insulation against a trustee's

preference attack.  *See Sanyo Elec., Inc. v. Taxel (In re World Fin. Services Ctr.,*

*Inc.),* 78 B.R. 239, 241 (9th Cir. BAP 1987), *aff'd,* 860 F.2d 1090 (9th Cir. 1988)

(unpublished disposition); *McClendon v. Cal-Wood Door (In re Wadsworth*

*Bldg. Components, Inc.),* 711 F.2d 122, 124 (9th Cir. 1983).

Moreover, as noted above, the record is unclear when during the

preference period Farson made monthly payments to Scantlin.  While the

evidence shows that Scantlin made payments to Capital One during both

June and July, 2005, there is no evidence to show that these payments

came after (*i.e.,* in exchange for) any payments made by Farson to Scantlin.

Ex. B.  Simply put, Scantlin offered no competent evidence that he

MEMORANDUM OF DECISION - 29

extended any new value to Farson in exchange for any of the payments

she made to him during the preference period.

Accordingly, under § 547(b) and § 550(a), Plaintiff may recover the

two monthly payments from Scantlin as preferences.

## II.
### The Exemption Claim

A chapter 7 trustee is entitled to possession of estate property, and

the debtor has a duty to surrender it to him. 11 U.S.C. §§ 521(a)(4), 542(a);

*In re Adams*, 92 I.B.C.R. 47, 47 (Bankr. D. Idaho 1992).  Plaintiff alleged that

the Mustang was property of the estate, and sought an order requiring

Defendants to turn it over to him for liquidation.  While Defendants

initially resisted,[14] they eventually conceded that the Mustang was indeed

property of the estate, and that Plaintiff is entitled to possession.

---

[14] Defendants' Answer to Plaintiff's Amended Complaint alleged that
"the value of the vehicle is less than the combined total of the money owed to a
secured creditor and the debtor Judy Farson Scantlin's homestead [sic]
exemption."  Answer, ¶ 5, BK Docket No. 8.  While it may have practical
implications, the value of property of estate has no impact on the trustee's
statutory right to possession of such property.

MEMORANDUM OF DECISION - 30

In her original schedules filed along with her petition, Farson

neither listed the vehicle as an asset, nor claimed it as exempt.  BK Docket

No. 1.  On August 22, 2007, approximately one month after Plaintiff

commenced this adversary proceeding, Farson amended her schedules to

list the vehicle as an asset on Schedule B, and to claim it exempt on

Schedule C under Idaho Code § 11-605(3) in the amount of $3,000.  BK

Docket No. 28; 29.

While Plaintiff's Amended Complaint in this adversary proceeding

included a claim for turnover of the Mustang, Plaintiff never formally

objected to Farson's claim of exemption asserted in her amended Schedule

C.  Indeed, Plaintiff asserted no challenge to Farson's exemption claim

until he sought to amend his complaint in this action to conform to the

evidence at the conclusion of the trial.

Rule 4003 provides, in pertinent part:

> A party in interest may file an objection to the list
> of property claimed as exempt within 30 days
> after the meeting of creditors held under § 341(a)
> is concluded or within 30 days after any
> amendment to the list or supplemental schedules

MEMORANDUM OF DECISION - 31

is filed, whichever is later.  The court may, for
cause, extend the time for filing objections if,
before the time to object expires, a party in
interest files a request for an extension.

From the Court's docket, it is clear that Plaintiff failed to either

object to the claimed exemption in the amended schedules, or seek an

extension of time in which to do so.  Under the Code, if the Rule 4003

objection period expires without a proper objection being made, the

debtor's property "is exempt."  11 U.S.C. § 522(l).  In the bankruptcy

vernacular, this is referred to as "exemption by default" or "exemption by

declaration."  *Heintz v. Carey (In re Heintz),* 198 B.R. 581, 583-84 (9th Cir.

BAP 1996).

The United States Supreme Court has imposed a bright line rule

concerning the necessity of objecting to a claim of exemption in a timely

manner.  In *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643-44 (1992), the court

rejected a trustee's untimely objection to a claimed exemption, holding

simply that he "cannot contest the exemption at this time whether or not

[the debtor] had a colorable statutory basis for claiming it."  *Id*.; see also

MEMORANDUM OF DECISION - 32

*Crawforth v. Bachman (In re Bachman)*, 07.4 I.B.C.R. 82 (Bankr. D. Idaho 2007). This Court therefore has no discretion to disallow an exemption in the absence of a timely objection.

Plaintiff essentially argues that his failure to object is of no moment because § 522(g) precludes Farson's claim of exemption on property recovered by Plaintiff under § 547 if Farson made the transfers voluntarily or concealed the property.[15] The BAP has explained the function of this statute:

> The purpose of § 522(g) is to prevent a debtor from claiming an exemption in recovered property which was transferred in a manner giving rise to the trustee's avoiding powers,

---

[15] Section 522(g) provides:
> Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if –
>> (1)(A) such transfer was not a voluntary transfer of such property by the debtor ; and
>> (B) the debtor did not conceal such property; . . .

MEMORANDUM OF DECISION - 33

> where the transfer was voluntary or where the
> transfer or property interest was concealed.  Since
> the Code is based upon providing honest debtors
> with a fresh start, a debtor who has voluntarily
> transferred property in an avoidable transaction
> or who has been dishonest in concealing assets or
> prepetition transfers should not be allowed to use
> § 522(g) as a shield.

*Hitt v. Glass (In re Glass)*, 164 B.R. 759, 764 (9th Cir. BAP 1994), *aff'd,* 60 F.3d

565 (9th Cir. 1995) (internal citation omitted).

The obvious difficulty with Plaintiff's position is that § 522(g)

requires that the property claimed exempt be *transferred* and then

*recovered*.[16]  The Code defines "transfer", in pertinent part as "every mode,

direct or indirect, absolute or conditional, voluntary or involuntary, of

disposing of or parting with property or with an interest in property . . . ;"

11 U.S.C. § 101(54).  Here, it is undisputed that there was no "disposing of"

or "parting with" the Mustang, and hence no transfer.[17]  It remained in

_____

[16]  The courts have adopted a broad reading of the term "recovered" under
§522(g).  *Hitt v. Glass (In re Glass)*, 60 F.3d 565, 569 (9th Cir. 1995).

[17]  The Court notes that the vehicle was not recovered under § 547, but
rather §542, which also implicates  §522(g).

MEMORANDUM OF DECISION - 34

Farson's possession the entire time; only Farson's payments were

transferred to Scantlin.  Although Plaintiff had to seek the Court's

determination that the vehicle was property of the estate, and that it

should be turned over to him, he was merely seeking to extract it from

Farson's grasp, not to "recover" the car from a third party to whom Farson

had transferred it.  Accordingly, § 522(g) constitutes no impediment to

Farson's claim of exemption in the Mustang.

III.

The Lien Reimbursement Claim

Lastly, Plaintiff seeks a money judgment against Scantlin for

$1,874.24 as reimbursement to the bankruptcy estate for the lien he caused

to be placed on the Mustang after the bankruptcy filing and without

Plaintiff's consent or the Court's permission.  As a statutory basis for this

request, Plaintiff inexplicably cites § 364(c)(2), which provides:

> (c) If the trustee is unable to obtain unsecured
> credit allowable under section 503(b)(1) of this
> title as an administrative expense, the court, after
> notice and a hearing, may authorize the obtaining
> of credit or the incurring of debt –

MEMORANDUM OF DECISION - 35

(2) secured by a lien on property of
the estate that is not otherwise
subject to a lien;

11 U.S.C. § 364(c)(2).

The Court is at a loss to explain how this statute is implicated in this

action, or how it allows Plaintiff to recover a money judgment against

Scantlin under these facts.  The cited Code provision, by its terms, applies

only to requests made by a trustee to incur secured credit during a

bankruptcy case, something of critical import in many reorganization

cases where, under § 1107, a debtor-in-possession stands in the trustee's

shoes for this purpose.  *See Sherman v. Harbin (In re Harbin)*, 486 F.3d 510,

521 n. 10 (9th Cir. 2007) (although section 364(c) refers to a trustee

obtaining credit, it applies with equal force to debtors in possession prior

to the appointment of a trustee); *Thompson v. Margen (In re McConville)*, 110

F.3d 47, 50 (9th Cir. 1997).

MEMORANDUM OF DECISION - 36

Section 364(c)(2) has no application in this context, and Plaintiff's

claim against Scantlin lacks any merit.[18]

### *Conclusion*

Plaintiff has proven that Defendant Scantlin received avoidable

preferences during the ninety days prior to Farson's bankruptcy filing.

Plaintiff is entitled to recover $778.42 (*i.e.*, $389.21 x 2) from Scantlin.

Farson is entitled to the exemption she claimed in the Mustang under

Idaho Code § 11-605(3) because Plaintiff did not timely object to that

exemption claim.  Plaintiff may not rely on § 522(g) as a defense to the

exemption claim.

Finally, Plaintiff's claim against Scantlin for reimbursement of funds

he received as a result of the post-petition Farmer's Bank loan under

---

[18]  Plaintiff's right to relief, if any, would likely be premised upon § 549(a) which allows a trustee to avoid certain unauthorized post-bankruptcy transfers of the property of the estate.  Arguably, as the beneficiary of the post-petition loan from Farmer's Bank, Scantlin could be the target of such a claim under § 550(a).  Plaintiff might also have sued Farmer's Bank to contest the validity of the lien under these circumstances.  Since Plaintiff has not asserted such claims, and since Farmer's Bank is not a party to this action, the Court is powerless to grant Plaintiff any relief.

MEMORANDUM OF DECISION - 37

§ 364(c)(2) is untenable; that Code provision is simply inapplicable in this

context.

A separate judgment will be entered.

Dated:  April 3, 2008

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 38